Jamie **RENAUDETTE**, Plaintiff,

v.

**Michael J. ASTRUE,**[1] **Commissioner, Social Security Administration, Defendant.**

**Civil Action No. 03–11214–RBC.**

United States District Court, D. Massachusetts.

April 2, 2007.

1. On February 12, 2007, Michael J. Astrue became the Commissioner of the Social Security Administration and so has been automatically substituted as the defendant in this case pursuant to Rule 25(d)(1), Fed.R.Civ.P.

Michael J. Kelley, Law Office of Michael J. Kelley, Boston, MA, for Plaintiff.

Christopher Donato, Boston, MA, for Defendant.

**MEMORANDUM AND ORDER ON MO- TION TO REVERSE OR REMAND THE DECISION OF THE COMMIS- SIONER OF SOCIAL SECURITY (# 8) AND DEFENDANT'S MO- TION FOR ORDER AFFIRMING THE DECISION OF THE COMMIS- SIONER (# 14)**

COLLINGS, United States Magistrate Judge.

### I.  Introduction

On June 26, 2003, plaintiff Jamie Renaudette (hereinafter "Renaudette" or "plaintiff") filed a complaint against defendant Michael J. Astrue, Commissioner of the Social Security Administration (hereinafter "the Commissioner" or "defendant"), seeking the reversal or remand of the defendant's decision denying an award of social security disability benefits.  The case was drawn to then Judge Mark L. Wolf.[2] The defendant filed an answer to the complaint on August 28, 2003.  On October 29, 2003, the plaintiff filed a Motion To Reverse Or Remand The Decision Of The Commission-

---

**2.**  Judge Wolf became Chief Judge on January 1, 2006.

er Of Social Security (# 8) together with a memorandum of law in support (# 9). On December 17, 2003, the defendant filed a Motion For An Order Affirming The Decision Of The Commissioner (# 14) along with memorandum of law in support (# 15).

The case remained with Judge Wolf from December 17, 2003 until August 10, 2006[3] when, with the parties' consent, the case was reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). The parties were granted leave to file supplemental briefs updating the law since approximately two and a half years had passed since the dispositive motions had been filed (# 19). The Commissioner filed a memorandum on September 11, 2006, and Renaudette filed her memorandum on November 13, 2006. With the record now complete, the parties' motions stand ready to be resolved.[4]

## II. Background

Born on January 3, 1954, Renaudette is now a 53 year old woman. (TR at 19) She previously applied for disability benefits which were denied on May 7, 1999. (TR at 41) On November 8, 2001, the plaintiff filed an application for disability benefits in which she claimed a disability onset date of April 22, 2001. (TR at 34) The alleged basis for her disability is nerve problems in her right arm. (TR at 46) The Social Security Administration denied this claim on April 20, 2002 (TR at 22–26) and about a month thereafter on May 15, 2002, Renaudette requested a hearing before an Administrative Law Judge (hereinafter "ALJ"). (TR at 27–28) On May 24, 2002, the plaintiff waived her right to appear before the ALJ. (TR at 31–33)

The ALJ considered the record and issued a decision denying benefits on January 31, 2003. (TR at 14–21) After Renaudette filed a request for a review of the hearing decision (TR at 9–10), the Appeals Council affirmed on April 24, 2003 (TR at 7–8) thereby rendering the ALJ's decision to be the final decision of the Commissioner. The plaintiff filed the instant action pursuant to 42 U.S.C. § 405(g) to have that final decision reviewed.

## III. The Facts

Renaudette worked as a cashier in a convenience store since 1992. (TR at 55) Her job duties included waiting on custom-

---

**3.** The docket does not reflect any activity during the two and one-half year period until plaintiff's attorney wrote a letter (# 16) on July 28, 2006 indicating his client's consent to a reassignment to a magistrate judge.

**4.** It is alleged in the complaint that the plaintiff lived in Weare, New Hampshire "for all periods relevant to this appeal." (# 1 ¶ 4) Although Title 42 U.S.C. § 405(g) provides, *inter alia*, that a civil action filed to review the final decision of the Commissioner "shall be brought in the district court of the United States for the judicial district in which the plaintiff resides", the defendant has not interposed any objection on the grounds of improper venue. "[T]he failure of the defendant to seasonably object waives the improper venue and does not affect the jurisdiction of this court to hear this particular case. 28 U.S.C. § 1406(b); *Panhandle Eastern Pipe Line Co. v.* *Federal Power Commission*, 324 U.S. 635, 638–39, 65 S.Ct. 821, 89 L.Ed. 1241 (1945)." *Davis v. Califano*, 437 F.Supp. 978, 979 n. 1 (N.D.Ill.1977); *see also Weinberger v. Salfi*, 422 U.S. 749, 763–764, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) ("Section 405(g) specifies the following requirements for judicial review: (1) a final decision of the Secretary made after a hearing; (2) commencement of a civil action within 60 days after the mailing of notice of such decision (or within such further time as the Secretary may allow); and (3) filing of the action in an appropriate district court, in general that of the plaintiff's residence or principal place of business. The second and third of these requirements specify, respectively, a statute of limitations and appropriate venue. As such, they are waivable by the parties, and not having been timely raised below, see Fed.Rules Civ.Proc. 8(c), 12(h)(1), need not be considered here.").

ers, working a register or computer, lifting groceries and lifting crates to help stock the store. (TR at 56–59) The plaintiff claims that her condition causes pain in her arm and tingling in her fingers and resulted in her having to stop working on April 22, 2001. (TR at 46)

The earliest medical records presented with respect to the plaintiff's condition date to 1998 when Renaudette was treated at Physical Therapy Network for pain in her wrist and knees. (TR at 75) Among other things, Dr. Betchart noted decreased wrist and knee range of motion and strength. (TR at 75) The plaintiff rated the pain in her right upper extremity at eight out of ten. (TR at 75) A physical therapy program to increase strength and decrease pain was recommended. (TR at 75)

Renaudette was seen in March of 1999 by Dr. Christopher Lynch. (TR at 76) Dr. Lynch noted that the plaintiff "had a long-standing history of right elbow pain, felt to be secondary to tendinitis" and had been treated with corticosteroid injections which provided effective, but short term relief. (TR at 76) The doctor also related that Renaudette "was formerly employed as a cashier but discontinued work due to an inability to stand for prolonged periods of time." (TR at 76) Following a physical examination, Dr. Lynch's impression was that, *inter alia,* the plaintiff had "chronic right lateral epicondylitis that would interfere with activities that required repetitive or strenuous use of the right upper extremity", but that "[s]endentary or other light activities would be permissible." (TR at 77)

The next records dated May 14, 2001, are from Concord Orthopaedics Professional Association where Renaudette was seen for an inflamed right wrist and hand. (TR at 78) Dr. Gary Woods discontinued her use of Medrol Dosepak because of side effects and began treating her with Vioxx

instead. (TR at 78) The doctor also instructed her to "modify some of her activities, continue using the splint" and return for another visit in a few weeks. (TR at 78)

On or about June 11, 2001, Renaudette requested a second opinion from a different doctor at Concord Orthopaedics Professional Association. (TR at 79) Dr. Edmund B. Rowland noted that the plaintiff complained of tingling in both hands, although more in her right, and that she has difficulty sleeping due to pain in her hips. (TR at 79) Upon examination, Renaudette complained of pain when the doctor "examine[d] the elbow for range of motion", when he "palpate[d] the thenar musculature, bilaterally", and when he "check[ed] passive wrist range of motion." (TR at 79–80) X-rays of the right wrist were normal in all respects. (TR at 80) Although the plaintiff had completed the course of Vioxx prescribed by Dr. Woods, the medication did not decrease her symptoms. (TR at 80) Dr. Rowland concluded that Renaudette was suffering from an "ill defined inflammatory process." (TR at 80) He ordered screening blood tests, the results of which were to be reviewed by Dr. Woods who would then decide on a treatment plan. (TR at 81)

On or about June 27, 2001, Renaudette self-referred to Quality Orthopedic Care where she was seen by Dr. Scott R. Devanny "for evaluation of bilateral wrist pain." (TR at 82) Upon physical examination, Dr. Devanny found that the plaintiff had "obvious symptoms of median nerve compression, right greater than left" and "diminished sensation to two-point discrimination within the median nerve distribution." (TR at 82–83) Dr. Devanny diagnosed Renaudette with "[b]ilateral median nerve compression", prescribed occupational therapy, continued use of braces and Voltaren. (TR at 83)

Dr. Devanny referred the plaintiff to the Rehabilitation Services of Concord Hospital where she was in physical therapy from June 27, 2001 until September 12, 2001. (TR at 93–105) The therapist, Wendy Roy, noted that Renaudette's "right elbow range of motion was 37–125 degrees with pain" and her right "wrist extension was 0–14 degrees with pain." (TR at 93) The plaintiff also had pain with thumb movement and full grip with the right hand. (TR at 93) There was decreased sensation in the right hand, as well as positive Tinel's and Phalen's tests on the right. (TR at 94) Renaudette's functional deficits included "work activities, grasping, writing, driving, and cleaning activities such as vacuuming, sweeping, and scrubbing." (TR at 94) The therapist recommended therapeutic exercise, use of a splint, stretching, manual therapy, message, nerve gliding and tendon gliding for three weeks, with two visits a week. (TR at 94) The plaintiff missed only two of the scheduled visits, one which was cancelled because the therapist was sick and one at which she was a no-show. (TR at 96, 105)

On July 18, 2001, Dr. Devanny saw the plaintiff again and noted that she had no significant improvement in her symptoms. (TR at 84) She was referred to Dr. Forrest for an EMG test. (TR at 84) About a month and a half later, on or about September 4, 2001, Dr. Devanny saw Renaudette again who, at that point, showed some slight improvement in her symptoms. (TR at 85) The results of the EMG had been received and "showed compression of the right median nerve at the elbow, which would be consistent with pronator syndrome" as well as possible tendinitis of the wrist. (TR at 85) Dr. Devanny "performed an injection of 1 cc of Celestone and 2cc of 1% Lidocaine into the area of the carpal tunnel and the flexor tendon mechanism of the wrist." (TR at 85)

At a visit two weeks thereafter, Dr. Devanny noted that there was no improvement of Renaudette's symptoms with occupational therapy. (TR at 86) With the diagnosis of "[m]edian nerve compression, pronator syndrome, proximally, based on EMG findings," Dr. Devanny planned on discussing the plaintiff's case with Drs. Forbes and Brenner in order to consider surgery for her condition.[5] (TR at 86)

The plaintiff was seen by Dr. Charles S. Brenner at the Hitchcock Clinic "for evaluation and treatment" on September 18, 2001. (TR at 122) After examining Renaudette, Dr. Brenner assessed her as having "[m]edian nerve entrapment, right forearm/pronator syndrome." He explained to her "that this syndrome is relatively unusual and certainly is unusual compared to carpal tunnel syndrome." (TR at 123) Although the surgical treatment was in most instances successful, it was also less predictable than carpel tunnel syndrome. (TR at 123) Dr. Brenner advised the plaintiff "that there was an 80 to 85 percent chance for improvement with the surgical procedure and somewhere between the 10 and 15 percent chance of no improvement and perhaps a 1 to 2 percent chance of being worse." (TR at 123)

The surgery was performed on October 3, 2001. (TR at 124) The operative report indicates that the median nerve was impinged upon as it entered the humeral head of the pronator. (TR at 127) The nerve was released, and no other areas of impingement or entrapment were found. (TR at 127) At a one week postoperative visit, Renaudette reported pain for the first two days following the surgical procedure, but thereafter the numbness in her

5. Dr. Devanny planned to consult with Dr. Forbes and Dr. Brenner rather than referring Renaudette back to Concord Orthopaedics Professional Association because she had "been fairly displeased with her care" there. (TR at 86)

hand had greatly improved as had the aching in her forearm. (TR at 124) Dr. Brenner found the scar was healing well and recommended beginning occupational therapy on October 22, 2001, to increase the range of motion of her elbow. (TR at 124)

On October 22, 2001, Renaudette was seen at the Rehabilitation Services of Concord Hospital for an initial evaluation post-surgery. (TR at 106) With respect to the plaintiff's range of motion, the therapist noted:

> [r]ight wrist extension 53 degrees and flex 21 degrees ... [r]ight arm supination 73 degrees and right pronation 69 degrees ... [r]ight elbow extension is at –82 degrees and flexion is 139 degrees ... [r]ight radial deviation 12 degrees and right ulnar deviation 20 degrees ... [r]ight thumb carpometacarpal palmar abduction 43 degrees.

TR at 106.

Renaudette could also touch all fingertips to her palm on the right hand, although she reported pain on a scale of 4 out of 10 at rest and pain at 10 out of 10 when reaching and grabbing. (TR at 106–107) The therapist thought the plaintiff's potential for rehabilitation to be "good" and recommended treatment one to two times a week for eight to ten weeks for assisted range of motion therapy, ultrasounds, splints as needed, icing, and reach and grasp tasks to increase strength. (TR at 107)

Renaudette did not show up to an appointment on October 26, 2001 and later stated that she was sick. (TR at 110) At a November 2, 2001 visit, the therapist noted that the plaintiff had "poor overall progress" due to her lack of attendance, pain and illness. (TR at 113)

Dr. Brenner saw Renaudette one last time on November 7, 2001 because of problems with the stitches which turned out to be "[h]ypersensitive scar." (TR at 125) The doctor found the plaintiff to have a limited range of motion of the elbow with extension, and prescribed a "Dynasplint to work on dynamic elbow extension." (TR at 125) Renaudette explained that she "had difficulty getting in for therapy as her insurance ha[d] expired." (TR at 125) The doctor stressed that it was critically important to regain the range of motion in the next few weeks, or her arm would be permanently stiff. (TR at 125)

In a rehabilitation re-evaluation dated November 21, 2001, the therapist noted that the plaintiff was making fair progress toward her short term goals. (TR at 115) Renaudette reported using her right upper extremity for about 25% of her daily tasks, but that pain and hypersensitivity continued to be limiting factors. (TR at 115) The plan was to continue therapy one or two times per week for three to four weeks. (# 115)

Renaudette failed to show up for two other therapy appointments on November 30, 2001 (due to a family emergency) and December 21, 2001. (TR at 116) Another re-evaluation report was completed on January 4, 2002. (TR at 118) The plaintiff reported increased numbness in her middle finger, waking up at night, inability to wash her own hair or reach to wash her back. (TR at 118) Her computer use was limited to 15 minutes at a time due to increased pain. (TR at 118) Her right elbow had 48 degree extension and 125 degree flexion. (TR at 118) The therapist observed that Renaudette still had significantly decreased range of motion, stiffness and pain with the right upper extremity. (TR at 118) The therapist also noted that the plaintiff had difficulty attending therapy sessions although she appeared to be motivated. (TR at 118) New goals were set for increasing elbow extension to reach for a cup and increasing elbow and wrist flexion to aid in bathing ability with the

right upper extremity. (TR at 118) The therapy was continued with one visit a week for eight to twelve weeks. (TR at 118)

In a re-evaluation report dated February 15, 2002, the therapist recorded Renaudette having good days and bad days, but reporting that the tingling had spread to her forearm and hand. (TR at 131) Her elbow extension was at 22 degrees, flexion at 130 degrees, pronation at 80 degrees and supination at 85 degrees. (TR at 131) Her right wrist extension was at 65 degrees and flexion at 35 degrees. (TR at 131) The plaintiff reported being able to wash her hair for the first time by leaning over the tub, although she still could not vacuum, drive, mop, make the bed or reach during bathing. (TR at 131) The therapist assessed Renaudette as having reached her range of motions goals but not her function goals in that she still had limitations in reaching and pain control. (TR at 131) New goals were set to include reaching, grasping and drinking from a cup at counter height and using her right arm for bathing 50–75% of her body. (TR at 131) The therapist recommended continuing therapy once a week for eight weeks due to the plaintiff's insurance and financial constraints. (TR at 131)

On February 22, 2002, Renaudette was seen by Dr. Devanny again complaining about pain in her middle finger, as well as symptoms in her right hand and arm. (TR at 87) Upon examination, Dr. Devanny found that the plaintiff's "objective findings do not meet her subjective complaints" in that she had "no circulatory deficit" and he observed good range of motion in the hand. (TR at 87) Dr. Devanny then stated that "I do not think there is anything I have to offer Jamie at this point in time." (TR at 87)

A May 3, 2002 re-evaluation report from Rehabilitation Services at Concord Hospital records the plaintiff as complaining of constant tingling from her right elbow to all fingertips. (TR at 132) The therapist observed 15 degree elbow extension, 145 degree elbow flexion, 75 degree wrist extension and 45 degree wrist flexion. (TR at 132) Renaudette could lift five pounds from the floor to her waist with her right arm, and could lift and carry two pounds. (TR at 132) The plaintiff reported being able to wash her hair by leaning over but not if reaching overhead, and she could still use the computer for only 15 minutes until there was too much pain to continue. (TR at 132) She could pick up and drink from a coffee cup but still could not carry it. (TR at 132) The therapist's assessment was that Renaudette continued to have "poor functional use of right upper extremity and no independent initiation of motion." (TR at 132) It was recommended that therapy continue with one visit per week for three to four more weeks to increase functioning and strength of her right upper extremity. (TR at 132)

There are three disability reports in the record, one from Dr. Brenner following his surgery, one from Dr. Devanny and one from Dr. Cataldo who performed a physical residual functional capacity assessment. (TR at 88–91, 129–130 and 133–142) Dr. Brenner's Statement of Disability was completed on October 3, 2001. (TR at 130) His diagnosis was pronator syndrome in the right forearm, with lateral epicondylitis of the right elbow. (TR at 129) He opined that Renaudette could not lift, carry, reach, work overhead, push or pull with the right arm. (TR at 130) He also limited her driving and recommended the plaintiff to avoid repetitive motions. (TR at 130) Dr. Brenner concluded that the plaintiff became unable to work because of her impairments as of April 20, 2001, but that it was "undetermined" how long the limitations would last. (TR at 130)

Dr. Devanny's statement of continued disability was completed on May 6, 2002. (TR at 89) His diagnosis was median nerve compression with subjective symptoms of right upper extremity weakness and pain. (TR at 89) He opined that Renaudette was limited to lifting or carrying 5 pounds, reaching or working overhead with her right arm with 5 pounds and that she has limited ability to push or pull with her right arm. (TR at 89) The plaintiff has only limited ability to perform repetitive hand motion or use a computer. (TR at 89)

Dr. Devanny also filled out a physical capacities evaluation form for Renaudette on May 7, 2002, wherein he wrote that she could sit, stand, walk and drive, each for eight hours in an eight-hour workday. (TR at 90) Dr. Devanny stated that the plaintiff could only occasionally lift or carry 1–10 pounds, occasionally push or pull 1–10 pounds and occasionally climb. (TR at 90) He determined that Renaudette could never balance, stoop, kneel, crouch or crawl, and that she could only reach above shoulder, at waist level or below the waist occasionally. (TR at 90–91) The plaintiff could also only handle occasionally, could never finger or feel with the right hand but could constantly do so with the left hand. (TR at 91) She could use her right foot, left foot and left hand repetitively, but not her right hand. (TR at 91) Dr. Devanny concluded that the restrictions are permanent, that Renaudette had reached maximum medical improvement, and that she could return to work with the restrictions noted. (TR at 91)

The medical consultant, Dr. Cataldo, agreed with the primary diagnosis of pronator syndrome. (TR at 133) He found that the plaintiff would be able to occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; he found no limitations for pushing or pulling; he found that she could stand, walk and sit for about six hours in an eight-hour day. (TR at 134) He determined that the plaintiff could climb, balance, stoop, kneel, crouch and crawl occasionally. (TR at 135) Dr. Cataldo found that claimant had a limited ability to reach in all directions, especially overhead with the right upper extremity. (TR at 136) He also concluded that she had a limited ability to handle and finger, and should avoid frequent gross and fine manipulation with the right hand. (TR at 136) The plaintiff retained full ability to pinch and grasp with both hands, and has full function of the left upper extremity. (TR at 136) She had no visual limitations, no communicative limitations and no environmental limitations. (TR at 136–137) Dr. Cataldo concluded as follows:

> The MER provided by her treating sources fails to support a Listings level of severity.

\* \* \* \* \*

> None of her treating or evaluating sources have expressed an opinion as to her actual retained functional capacity at this time. Her allegations of symptoms are credible but they are not credible for her ability to function.

TR at 139.

### IV. Standard of Review

Title 42 U.S.C. § 405(g) provides, in relevant part:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow ... The court shall have power to enter, upon the pleadings and transcript of the rec-

ord, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ...

The Court's role in reviewing a decision of the Commissioner under this statute is circumscribed:

> We must uphold a denial of social security disability benefits unless "the Secretary has committed a legal or factual error in evaluating a particular claim." *Sullivan v. Hudson,* 490 U.S. 877, 885, 109 S.Ct. 2248, 2254, 104 L.Ed.2d 941 (1989). The Secretary's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

*Manso–Pizarro v. Sec'y of Health and Human Services,* 76 F.3d 15, 16 (1st Cir. 1996); *see also Reyes Robles v. Finch,* 409 F.2d 84, 86 (1st Cir.1969) ("And as to the scope of court review, 'substantial evidence' is a stringent limitation.")

■ The Supreme Court has defined "substantial evidence" to mean " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) *quoting Consolidated Edison Co. of N.Y. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *Ortiz v. Sec'y of Health and Human Services,* 955 F.2d 765, 769 (1st Cir.1991). It has been explained that:

> In reviewing the record for substantial evidence, we are to keep in mind that "issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary." The Secretary may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts. We must uphold the Secretary's findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion.

*Lizotte v. Sec'y of Health and Human Services,* 654 F.2d 127, 128 (1st Cir.1981) *quoting Rodriguez v. Sec'y of Health and Human Services,* 647 F.2d 218, 222 (1st Cir.1981); *Geoffroy v. Sec'y of Health and Human Services,* 663 F.2d 315, 319 (1st Cir.1981) ("In any event, whatever label the parties or the court ascribe to the procedure used to review the Secretary's decision, statute and long established case law make clear that the court's function is a narrow one limited to determining whether there is substantial evidence to support the Secretary's findings and whether the decision conformed to statutory requirements." (citations omitted)).

■ In other words, if supported by substantial evidence, the Commissioner's decision must be upheld even if the evidence could also arguably admit to a different interpretation and result. *Ward v. Commissioner of Social Security,* 211 F.3d 652, 655 (1st Cir.2000); *see also Nguyen v. Chater,* 172 F.3d 31, 35 (1st Cir.1999). Lastly,

> Even in the presence of substantial evidence, however, the Court may review conclusions of law, *Slessinger v. Secy' of Health & Human Servs.,* 835 F.2d 937, 939 (1st Cir.1987) (per curiam) (*citing Thompson v. Harris,* 504 F.Supp. 653, 654 [(D.Mass.1980)]), and invalidate findings of fact that are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts," *Ngu-*

*yen v. Chater,* 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

*Musto v. Halter,* 135 F.Supp.2d 220, 225 (D.Mass.2001).

### V. Discussion

■ In seeking remand or reversal, Renaudette contends that the ALJ's decision is not supported by substantial evidence. The plaintiff argues, *inter alia,* that in making his credibility judgment, the ALJ wrongly described or misrepresented her activities of daily living. The ALJ considered the plaintiff's daily activities as detailed in her disability report, i.e., driving her car, doing the laundry, making the beds, and performing other domestic tasks, as failing to evidence "an extreme loss of function of both upper extremities." (TR at 17) Renaudette notes, however, that in her disability report she stated that she only goes out of the house once a week with limited driving of her car to go to rehabilitation. (# 9 at 15; TR at 46) Further, in her disability report the plaintiff indicated that she needed help making the beds. (TR at 64)

Renaudette complains that in her disability report she stated that her husband washed her hair. That is true, but the disability report is dated November 21, 2001. (TR at 66) The physical therapy report upon which the ALJ relied (TR at 131) post-dated the disability report, to wit, February 15, 2002, and so reasonably could be viewed as incorporating more up-to-date information. Lastly, the plaintiff takes issue with the fact that although the ALJ correctly stated that the records reflect that she could use the computer for fifteen minutes at a time (TR at 118), the ALJ did not add the limitation "without an increase in pain" thereby downplaying her limitations.

These factual inaccuracies are troubling, but alone may not be sufficient to establish error. Far more disturbing are certain other aspects of the ALJ's decision. Several paragraphs appear to be boilerplate, cut and pasted from another decision. While that practice in and of itself may not be objectionable, in this instance it raises considerable doubt as to whether the ALJ in fact gave Renaudette's case fair consideration. For example, the ALJ wrote:

> The claimant's statements concerning *his* impairments and their impact on *his* ability to work are not entirely credible in light of the claimant's own description of *his* activities and lifestyle, the degree of medical treatment required, the reports of the treating and examining practitioners, and the findings made on examination.

TR at 17 (emphasis added).

Given the plaintiff's first name, Jamie, some confusion could be understandable. However, the ALJ goes back and forth throughout the decision between the feminine and the masculine. The ALJ's repeated use of the masculine possessive, coupled with the factual inaccuracies about the plaintiff's activities of daily living, casts doubt on how closely and carefully the ALJ considered the evidence in this case.

In another place, the ALJ wrote:

> The claimant's alleged impairments, symptoms, medication, daily activities, and appearance and testimony at the hearing have been carefully considered. The Administrative Law Judge, after consideration of Social Security Regulations 404.1529 and 416.929, including the nature, frequency, location, duration, and intensity of the claimant's purported pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication, that the claimant has undergone for relief; and other factors concerning the claimant's functional limitations and restric-

tions due to pain or other symptoms, concludes that the claimant's allegations of subjective complaints are exaggerated and are not credible to limit the claimant in *his* ability to perform substantial gainful employment.

TR at 18 (emphasis added).

Once again, the use of the masculine possessive is noted. Further, the ALJ's statement that he considered Renaudette's "appearance and testimony at the hearing" in making his decision is impossible when in fact there was no hearing held in this case. (TR 31–33) Indeed, earlier in the decision the ALJ, again improperly employing the masculine possessive, states that "[t] he claimant waived his right to an oral hearing and requested that his case be decided on the record". (TR at 14) This internal inconsistency highlights the problem with cut-and-pasting boilerplate language, and raises substantial questions with respect to what the ALJ did, in fact, consider in reaching his decision.

The most egregious example of the usage of boilerplate is the second paragraph below:

> Accordingly, the undersigned finds that the claimant retains the following residual functional capacity: sedentary work, which is usually performed while sitting, and requires the ability to lift five pounds frequently and ten pounds occasionally. The claimant must avoid frequent reaching with her upper extremity and frequent gross and fine manipulation with her right hand. She retains the ability to pinch and grasp with both hands, and retains full function of the left upper extremity.
>
> In reaching this conclusion, the undersigned adopts the medical opinions of the State agency medical consultants at the initial and reconsideration levels re-

garding the claimant's abilities to do work-related activities. Although the state agency medical consultants did not examine the claimant, they provided specific reasons for their opinions about the claimant's residual functional capacity showing they were grounded in the evidence in the case record. The undersigned finds that evidence received into the record after the reconsideration determination did not provide any new or material information that would alter any findings about the claimant's residual functional capacity (20 CFR 404.1527(d) (sic) and (f), 416.927(d) and (f); Social Security Rulings 96–2p, 96–6p, 96–8p).

TR at 18.

Renaudette filed for disability benefits on November 8, 2001. (TR at 34) The initial agency disability determination was dated March 28, 2002 and incorporated the RFC completed by Dr. Cataldo dated March 25, 2002. (TR at 22; 133–142) There is no document in the record indicating that the plaintiff sought reconsideration of this initial denial, nor it there a separate document reflecting the agency's action on reconsideration.[6]

At the bottom of the initial disability determination form, there is a signature of an SSA representative and a date of April 20, 2002. (TR at 22) The notice of disapproved claim is dated April 22, 2002, and advised Renaudette that if she disagreed with the decision, her next step was to request a hearing. (TR at 23–26) In the administrative process, a hearing before an ALJ follows a denial on reconsideration by the agency. (TR at 27) From these facts the Court infers that the reconsideration is indicated by the signature at the bottom of

---

6. Both of these documents are typically included in the administrative record in social security appeals.

the initial disability determination. (TR at 22)

The administrative record contains a Medical Consultant's Review of Physical Residual Functional Capacity Assessment dated April 13, 2002, predating the notice of disapproval by eight days. (TR at 67–69) The medical consultant's signature is illegible, but the form indicates that the "review concerns the SSA–4734–U8 dated 3/25/02" which is the RFC completed by Dr. Cataldo. (TR at 67; 133–142) Presumably this is the medical opinion of the state agency medical consultant at the reconsideration level to which the ALJ refers in his decision.[7]

In Part A—Evaluation, the medical consultant indicated agreement with all of the limitations recorded in the March 25, 2002 RFC. (TR at 67) The DDS discussion of limitations was noted to be complete as was the DDS discussion and assessment of symptoms. (TR at 67) In Part A III, Treating or Examining Source Statements, the medical consultant is asked to "[c]heck 'complete' if the DDS discussed all relevant treating or examining source statements not already discussed in Sections I or II of the" RFC. (TR at 67) Given the choices of "complete," "omitted" and "inadequate," the medical consultant checked omitted. (TR at 67) The medical consultant is directed to proceed to Part C of the form if agreement with all of Part A had been indicated. (TR at 67)

Although the medical consultant was in agreement with everything in Part A, he/she went on to Part B. (TR at 68) In Part B—DQB MCS Discussion, the medical consultant is asked to cite each item in dispute with the RFC being reviewed and for each item cited, to show his/her conclusions and explain how and why the evidence supports those conclusions. (TR at 68) In the space allotted, the medical consultant wrote "RFC of a one armed individual."[8] (TR at 68) In Part C—Conclusion, the medical consultant indicated that he/she agreed with the conclusions in the March 25, 2002 RFC. (TR at 68)

Contrary to what the ALJ states in his decision, the medical consultant did not provide any specific reasons for his/her opinion about the claimant's residual functional capacity showing. That point aside, the reference in the medical consultant's review to an "RCF of a one armed individual" is incomprehensible; Renaudette is not "a one armed individual." This factual mistake is fundamental. The error plainly implicates the validity of the medical consultant's opinion and, in turn, that of the ALJ's decision since the medical consultant's opinion was specifically adopted by the ALJ. (TR at 18) T o summarize, the ALJ's decision is riddled with factual errors and misstatements. The cumulative effect of these mistakes undermines any confidence either that the evidence in the plaintiff's case has been fully and fairly considered or that the ALJ's decision was supported by substantial evidence. In light of the "number of unanswered and troubling questions", this case must be remanded to the Commissioner in order to reopen and review Renaudette's disability claim. *See Guzman Diaz v. Secretary of*

---

7. In the List of Exhibits, Disability Related Development and Documentation, at the beginning of the administrative record, these documents are described as "Medical Consultants (sic) Review of Physical Functional Capacity Assessment dated 04/13/02" and "DQB Medical Consultant Review dated 04/13/02." (TR at 4) Apart from the RFC completed by

Dr. Cataldo, this is the only other medical opinion of the state agency medical consultant in the record.

8. There no discussion in Dr. Cataldo's March 25, 2002 RFC about a "one armed individual." (TR at 133–142)

*Health, Education and Welfare,* 613 F.2d 1194, 1200 (1st Cir.1980).

### VI. Conclusion

For all the reasons stated it shall be, and hereby is, ORDERED that the Motion To Reverse Or Remand The Decision Of The Commissioner Of Social Security (# 8) be, and the same hereby is, ALLOWED to the extent that this case is REMANDED for further proceedings consistent with this opinion. The Secretary may designate that the "remanded proceedings [ ]be held before a different judge who, whatever the eventual result, can take a completely fresh look ..." at this case. *Guzman Diaz,* 613 F.2d at 1200. It is FURTHER ORDERED that Defendant's Motion For Order Affirming The Decision Of The Commissioner (# 14) be, and the same hereby is, DENIED.